

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PATRICIA BRAUN,

                              Plaintiff,

    -against-

                              **OPINION & ORDER**
                              **07 CV 02198 (SJF) (WDW)**

SECURITAS SECURITY SERVICES
USA, INC. et al,

                              Defendants.
------------------------------------------------------------X
FEUERSTEIN, J.

1.     Introduction

On May 29, 2007, *pro se* plaintiff Patricia Braun ("Plaintiff") commenced this action against defendants Securitas Security Services USA, Inc. ("Securitas") and Frank Trombino ("Trombino") (collectively, "Defendants") alleging, *inter alia*, that Defendants discriminated, harassed, terminated, and retaliated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). For the reasons set forth herein, Defendants' motion is GRANTED.

II.     Background[1]

---

[1] The facts are derived from Defendants' statement of material facts pursuant to Local Rule 56.1 and the accompanying declarations and other evidentiary material filed in support of Defendants' motion for summary judgment, as well as Plaintiff's response to Defendants' statement and counterstatement of disputed material facts and the accompanying declarations and evidentiary material filed in response to the motion.

1

A. Factual Background

On January 12, 1995, Plaintiff was hired as an at-will employee by Securitas and assigned to work as a security officer at Newsday in Melville, New York. In August 2001, Plaintiff was placed on medical leave for lymphedema, chronic venuous ulcers, and post phlebitis syndrome. Plaintiff returned to work in February 2002 without any medical restrictions.

In October 2004, Securitas hired Trombino as the Assistant Site Manager to assist Account Manager Carl Johansson ("Johansson") at the Newsday site. Trombino was Plaintiff's supervisor. Shortly after Trombino was hired, Securitas lost its account with Newsday. In August 2005, Plaintiff's position at Newsday was eliminated, along with approximately twenty (20) other security officers and Plaintiff was "laid off" by Securitas on or about August 17, 2005.

Newsday subsequently hired five (5) security officers who had been employed by Securitas. Although Plaintiff was interviewed by Newsday for a security position, she, along with many others who were interviewed, did not receive a job offer from Newsday.

By letter dated October 10, 2005, Securitas offered Plaintiff a choice of four (4) reassignment posts. Plaintiff initially accepted one of the reassignment posts, but rescinded her acceptance after visiting the site because, *inter alia*, she "did not feel safe." (Pl.'s Aff. in Opp'n to Defs.' Mot. for Summ. J, filed Oct. 27, 2008 ("Pl.'s Aff."), ¶ 27.) Thereafter Securitas informed Plaintiff, by letter dated in or about November 2005 ("November 2005 Letter"), that Plaintiff had voluntarily terminated her employment with Securitas "since she had refused to accept any reassignment offers, and because she had remained inactive for over 30 days." (Decl. of Susan Cirrone ("Cirrone"), dated Sept. 22, 2008 ("Cirrone Decl."), ¶ 25.)

Plaintiff contacted Sherry Pinchik in Securitas' Employee Relations Department to

discuss the November 2005 Letter, after which, Securitas, by letter dated January 3, 2006, again offered Plaintiff a choice of four (4) additional reassignment posts. Plaintiff accepted one of the reassignment posts and was required to report to work on January 14, 2006.

On January 12, 2006, Plaintiff was admitted to Stony Brook University hospital. Plaintiff was discharged the next day. On January 13, 2006, Plaintiff's daughter contacted Securitas to advise that Plaintiff was in the hospital and unable to report to work on January 14, 2006, and that Plaintiff would contact Securitas as soon as possible. Plaintiff's daughter also told Securitas that she had a doctor's note and Securitas informed her that she could leave the doctor's note with anyone at Securitas' office.

By letter dated January 17, 2006, Securitas informed Plaintiff that its offer of employment was rescinded because, *inter alia*, Plaintiff had not reported to work or otherwise contacted Securitas following her daughter's telephone call on January 13, 2006. Plaintiff alleges that she called Securitas on January 17, 2008 "with no response." (Pl.'s Counter Statement of Material Facts, filed Oct. 27, 2008 ("Pl.'s Counter Statement"), ¶ 25.) According to Plaintiff, on January 18, 2006, she spoke with Cirrone, who informed Plaintiff that Securitas was rescinding its offer and "to keep the [doctor's] note." (Pl.'s Aff. ¶ 30.)

B. Plaintiff's Allegations

Plaintiff alleges, *inter alia*, that Trombino "tried to intimidate everyone," (Pl.'s Aff ¶ 15), made Plaintiff feel "uncomfortable" and "embarrassed" Plaintiff. (Pl.'s Counter Statement ¶ 12.) Plaintiff further alleges that Trombino used foul language in her presence, although he did not direct such language at Plaintiff, and, in one instance, remarked that Plaintiff was "lazy." (Pl.'s

3

Dep., dated May 1, 2008 ("Pl.'s Dep."), 120:22.) In addition, Plaintiff alleges that, after an "irate visitor" left the Newsday site, Trombino stated "[l]et's send [Plaintiff] after her because I know I am afraid of her." (Pl.'s Counter Statement ¶ 5, see also Pl.'s Dep. at 119:5-6.) Plaintiff further alleges that Trombino stated to Plaintiff that he was not sure if he was going to "keep" her, and that Trombino stated to a co-worker that he "wanted to get rid of [Plaintiff]." (Pl.'s Counter Statement ¶¶ 7, 9.) Plaintiff also alleges that Trombino "tried to send" Plaintiff to "another building" because Trombino knew Plaintiff had "trouble with constant walking." (Id. at ¶ 8.)

Referring to Plaintiff, Trombino told a co-worker that he had sent "that fat slob over to the other building, that's her post now." (Decl. of Angela Holloway, attached as Ex. E to Pl.'s Aff.) Another co-worker indicated that Trombino had "made a number of references to removing [Plaintiff] from [her original post at Newsday]" because Trombino "felt that [Plaintiff] could not respond quick enough . . . in case of [an e]mergency or . . . [Plaintiff's] size and health condition at that time was a hindrance to her job performance." (Letter from Aaron A. McMillan, dated October 10, 2006, attached as Ex. N to Pl.'s Aff.)

On February 21, 2005, Plaintiff contacted Cirrone to complain about, *inter alia*, Trombino's management style.[2] In response to Plaintiff's complaint, Securitas commenced an investigation, including interviews of witnesses whose names were provided by Plaintiff. By letter dated April 1, 2005 ("April 2005 Letter"), Securitas informed Plaintiff that it had investigated Plaintiff's concerns and found that Trombino was not "engaging in any illegal conduct." (April 2005 Letter, attached as Ex. Q to Pl.'s Aff.) The April 2005 Letter further

---

[2] Plaintiff does not provide specific dates for many of her allegations, therefore, it is unclear exactly which allegations she raised in her complaint to Cirrone.

4

stated, *inter alia*, that Securitas "believe[s] there may be a personality conflict between the two of you, but unfortunately, you are the only employee who is having continuous difficulty working with [Trombino]." (Id.) In addition, Securitas informed Plaintiff that she was "required to comply with [Trombino's] directives" as he is "entitled to manage and supervise his employees as appropriate," and that Plaintiff should advise Securitas if she felt unable to do so. (Id.) Securitas also offered Plaintiff the option of taking another position, "with the same shift, and same rate of pay." (Id.)

On or about August 20, 2005, Plaintiff filed a complaint with the New York State Division of Human Resources ("NYSDHR Complaint") and, on or about January 19, 2007, Plaintiff filed a complaint with the Equal Employment Opportunity Commission alleging, *inter alia*, that Defendants discriminated against her. (See Compl. ¶¶ 9-10.)

C. Plaintiff's Disciplinary Record

After Johansson issued a memo to all security officers stating the new post orders for Newsday security staff, Trombino issued a disciplinary action report ("DAR"), on or about March 27, 2005, alleging Plaintiff's "[u]nsatisfactory work performance," "[i]nsubordination," "[f]ailure to obey orders" and "[r]eporting out of uniform." (DAR, attached as Ex. D-15 to Pl.'s Dep.) Although Plaintiff disputes that she was insubordinate, she concedes that on that occasion she was not in proper uniform. Trombino also disciplined Plaintiff twice for insubordination, eating on post, failure to obey work orders, and failure to comply with the uniform policy without issuing a DAR to Plaintiff.

5

III. Discussion

    A.    Legal Standard

Summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (citations and quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." Id. An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried . . . If the nonmoving party does not so respond, summary judgment will be entered against him."

Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . ., or 'upon the mere allegations or denials of the [nonmoving] party's pleading.'" Id. (quoting Fed. R. Civ. P. 56(e)).

B.  Plaintiff's *Pro Se* Status

Where a plaintiff is proceeding *pro se*, the court must review the *pro se* party's supporting papers liberally, and "interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (citation and quotation marks omitted); see also Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Nevertheless, a *pro se* plaintiff's "bald assertion," completely without evidentiary support is not sufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); see Columbo v. United States Postal Serv., 293 F. Supp. 2d 219, 222 (E.D.N.Y. 2003) ("*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation and quotation marks omitted); see also Karl v. Asarco Inc., No. 02 Civ. 5565, 2004 WL 2997872, at *3 (S.D.N.Y. Dec. 23, 2004) (liberal standard does not excuse a *pro se* plaintiff from "following the procedural formalities of summary judgment"); Saldana v. Local 32B-32J Serv. Employer Int'l Union, No. 03 Civ. 1853, 2005 WL 66895, at *2 (S.D.N.Y. Jan.12, 2005) ("Even a *pro se* plaintiff, however, cannot withstand a motion for summary judgment by relying merely on the allegations of the complaint. Rather, when confronted with evidence of facts that would support judgment in the defendant's favor as a matter of law, the plaintiff must come forward with evidence in admissible form that is capable of refuting those facts.").

C.   ADA Claim[3]

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) that the plaintiff's "employer is subject to the ADA;" (2) that the plaintiff "is disabled within the meaning of the ADA or perceived to be so by [the plaintiff's] employer;" (3) that the plaintiff "was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation;" and (4) that the plaintiff "suffered an adverse employment action because of [the plaintiff's] disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008) (citing Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004)).

If the plaintiff meets the burden of establishing a *prima facie* case, "[t]he burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action." Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999) (citing Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994)). The burden then shifts back to the plaintiff to "show that the proffered reason was merely a pretext for discrimination, which 'may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more.'" Heyman, 198 F.3d at 72 (quoting Chambers, 43 F.3d at 38) (citations and quotation

---

[3] The ADA was recently amended, effective January 1, 2009 ("ADA Amendments"). See ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008). Unless otherwise specified, the results in this action are the same whether the Court applies the ADA prior to or consistent with the ADA Amendments.

8

marks omitted)).

Plaintiff alleges that she was discriminated against because she is "overweight" and has "leg and hip problems." (Compl. ¶ 7.) Even assuming, *arguendo*, that Plaintiff could state a *prima facie* case of discrimination under the ADA, Plaintiff fails to show that Defendants' proffered reasons for their actions are merely a pretext for discrimination.

There is sufficient evidence on the record to establish that Plaintiff was "laid off" by Securitas because Securitas lost its account with Newsday. Plaintiff was one of approximately twenty (20) Securitas' employees whose positions were eliminated in or about August 2005. Plaintiff's conclusory assertions that, *inter alia*, her position was not eliminated in August 2005 and that Defendants used its downsizing at Newsday as a pretext, without any evidentiary support, is insufficient to defeat a motion for summary judgment.

In addition, approximately two (2) months after Plaintiff was "laid off," Securitas offered Plaintiff four (4) alternate reassignment posts. Although Plaintiff asserts that she declined one reassignment post because she felt that, *inter alia*, it was not safe, she fails to indicate a basis for refusing the other reassignment posts offered. Securitas even offered Plaintiff an additional four (4) reassignment posts after Plaintiff requested to continue her employment with Securitas, despite having determined that Plaintiff had voluntarily terminated her employment by declining reassignment and remaining inactive for more than thirty (30) days.

Although Plaintiff ultimately accepted a reassignment post, she does not dispute that she did not report to her reassignment post or that she did not speak to anyone at Securitas until approximately four (4) days after her daughter's initial telephone call informing Securitas that Plaintiff was in the hospital. This failure, coupled with the events previously noted, including,

*inter alia*, Plaintiff's previous failure to accept reassignment offers, is sufficient to establish that Securitas had a legitimate, nondiscriminatory reason for its actions. Plaintiff has not proffered any evidence to raise a triable issue of fact that Defendants' explanation is a mere pretext for discrimination.

Accordingly, Plaintiff's discrimination claim is dismissed.

D. Reasonable Accommodation

To establish a reasonable accommodation claim under the ADA, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006) (citations omitted). "[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Id. at 184 (citations and quotation marks omitted). However, "an employer has a duty reasonably to accommodate an employee's disability if . . . the employer knew or reasonably should have known that the employee was disabled." Brady, 531 F.3d at 135.

Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires . . . [and] does not include the 'marginal' functions of the position." Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 8 (2d Cir. 1999) (quoting 29 C.F.R. § 1630.2(n)(1)). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are

essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); see also Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.") (citation and quotation marks omitted). Other evidence of whether a particular function is essential includes, *inter alia*, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. 29 C.F.R. 1630.2(n)(3); Mitchell, 190 F.3d at 8 n. 3.

Even assuming, *arguendo*, that Plaintiff is disabled within the meaning of the ADA, Plaintiff's claim fails. There is no indication from the record that Securitas denied Plaintiff a reasonable accommodation. Plaintiff does not dispute that she did not request an accommodation and Plaintiff contends that she did not make such a request because "she could perform [her] job according to Post orders." (Pl.'s Aff. ¶ 10.)

In addition, although Plaintiff contends that she was able to perform her duties according to her post orders, Plaintiff has not proffered any evidence to show that she could perform the essential functions of a security officer with or without a reasonable accommodation.

Plaintiff alleges, *inter alia*, that: (1) she was obese; (2) she had leg and hip problems; (3) she could not perform at a post that required constant walking; (4) she had "a little problem walking" from her car to her post; (Pl.'s Dep. 71:15-16), and (5) she was able to perform at her assigned post because it was a "sedentary" post, (Letter to NYSDHR, attached to Compl.). However, the essential functions of a security officer include, *inter alia*: (1) "[f]requent sitting,

11

standing and walking, which may be required for long periods of time;" (2) "[o]ccasional lifting and/or moving up to 10 pounds and occasional lifting and/or moving up to 25 pounds;" (3) "[o]ccasional reaching with hands and arms, stopping, kneeling, crouching and crawling;" (4) "[o]n occasion," performing "stressful and physical activity; " and (5) responding to emergency situations. (Securitas' Security Officer Job Description, attached as Ex D-3 to Pl.'s Dep., p.3.)

Plaintiff has not proffered any evidence showing that she could perform the essential functions of a security officer with or without a reasonable accommodation, nor has Plaintiff suggested any accommodation that Securitas could have provided to enable her to do so. Although Plaintiff alleges she was able to perform at her post because, for the most part, she could remain sedentary, her post was eliminated because Securitas lost its account with Newsday. While "[t]he ADA lists reassignment to an existing, vacant position as a possible reasonable accommodation, . . . the ADA does not require creating a new position for a disabled employee." Graves, 457 F.3d at 187 (citations omitted).

Accordingly, Plaintiff's failure to accommodate claim is dismissed.

E. Retaliation

In order to establish a *prima facie* case of retaliation, the plaintiff must show that: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) (citing Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996), cert. denied, 520 U.S. 1228, 117 S.Ct.

1819, 137 L.Ed.2d 1027 (1997); Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)). A plaintiff may prove causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Board of Education, 232 F.3d 111, 117 (2d Cir. 2000).

"Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002). If the defendant meets that burden, the burden shifts back to the plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id.

Plaintiff asserts that Defendants retaliated against her because, *inter alia*, she "stood up for [herself] against Trombino and Securitas." (Pl.s' Aff. ¶ 31) Defendants do not dispute that Plaintiff's NYSDHR Complaint was a protected activity within the meaning of the ADA. Defendants, however, contend that Plaintiff cannot state a *prima facie* case for retaliation under the ADA because there is no causal connection between the filing of the NYSDHR Complaint and Securitas "laying off" Plaintiff or Securitas rescinding its offer to Plaintiff for reassignment. Even assuming, *arguendo*, that Plaintiff could state a *prima facie* case, Plaintiff fails to show that Defendants' proffered reasons for their actions are merely a pretext for impermissible retaliation

As noted above, there is sufficient evidence on the record to indicate that Securitas "laid off" Plaintiff in August 2005 because Securitas lost its Newsday account. Plaintiff was

subsequently offered eight (8) reassignment posts, four (4) of which were offered after Securitas determined that Plaintiff had voluntarily terminated her employment. Securitas rescinded its offer to Plaintiff for reassignment in January 2006 because, *inter alia*, she failed to report to her reassignment post and failed to contact Securitas to its satisfaction regarding her absence.

Accordingly, Plaintiff's retaliation claim is dismissed.

F. Hostile Work Environment

Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environment, see Bonura v. Sears Roebuck & Co., 62 F. App'x. 399, 400 n.3 (2d Cir. 2003), several district courts in this circuit have held that such claims are cognizable. See, e.g., Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 208 (E.D.N.Y. 1997) (analyzing ADA hostile work environment claim under the same standard utilized in Title VII cases same); Hudson v. Loretex Corp., No. 95 Civ 844, 1997 WL 159282, at *2-3 (same). A work environment is hostile " 'when the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Torres v. Pisano, 116 F.3d 625, 630-31 (2d Cir. 1997) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). When analyzing a hostile work environment claim, courts should consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767-68 (2d Cir.1998). Generally, isolated incidents of harassment do not give rise to a hostile work

14

environment claim; instead, the incidents must be "'sufficiently continuous and concerted in order to be deemed pervasive.'" Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997) (quoting Harris, 510 U.S. at 17, 114 S.Ct. 367). "However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition." Quinn, 159 F.3d at 768.

The Court need not reach the issue of whether the ADA gives rise to a cause of action for hostile work environment as there is insufficient evidence on the record to indicate that Plaintiff's workplace was "permeated with discriminatory intimidation . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris, 510 U.S. at 21; see also Oncale v. Sundowner Offshore Services, 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (noting the Supreme Court's desire to set the standards for a viable hostile work environment claim sufficiently high to prevent converting Title VII into a "general civility code" for the workplace).

Accordingly, Plaintiff's hostile work environment claim is dismissed.

IV. Conclusion

The motion (Docket No. 26 ) of defendants Securitas Security Services USA, Inc. and Frank Trombino for summary judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED. The Clerk of Court is directed to close this case.

**SO ORDERED.**

_____
Sandra J. Feuerstein
United States District Judge

January 20, 2009
Central Islip, New York


Copies to:

Patricia Braun
21 Pearsall Place
Deer Park, NY 11729

William Henry Healey
Mandelbaum Salsburg
155 Prospect Avenue
West Orange , NJ 07052